## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **In re:** ) | |
| ) | |
| **Meadowbrook Farms Cooperative,** ) | |
| ) | |
| **Debtor.** ) | |
| ) | |
| **THE CIT GROUP/BUSINESS CREDIT,** ) | |
| **INC.,** ) | |
| ) | |
| **Appellant,** ) | |
| ) | |
| vs. ) | **CIVIL NO. 10-623-GPM** |
| ) | |
| **GREAT LAKES PORK, INC.,** ) | |
| **JOHNSON-PATE PORK, INC., and** ) | |
| **LEHMANN BROTHERS FARMS, LLC,** ) | |
| ) | |
| ) | |
| **Appellees.** ) | |

# **MEMORANDUM AND ORDER**

**MURPHY, District Judge:**

This bankruptcy appeal came before the Court for oral argument on February 28, 2011. Thereafter, the parties supplemented the record as ordered by this Court. Having fully considered all the papers on file and the arguments presented, the Court rules as follows.

### FACTUAL BACKGROUND

In March 2009, Meadowbrook Farms Cooperative (MFC or the Debtor) filed a petition for Chapter 7 relief in the United States Bankruptcy Court for the Southern District of Illinois. The Debtor was an agricultural cooperative, or packer, that purchased hogs for slaughtering and processing. It packed and sold pork and pork products subject to the Packers and Stockyard Act

of 1921 (PSA), 7 U.S.C. §§ 181 *et seq.* Laura K. Grandy was appointed Bankruptcy Trustee for the Debtor and later was succeeded by Dana Frazier. In June 2009, the Trustee filed a complaint to determine the validity of claims to a roughly $2.2 million lockbox fund held by the Trustee. The parties stipulated that the entirety of the fund was derived from accounts receivable and proceeds from the sale of livestock inventory and meat and meat food products derived from livestock purchased by the Debtor from certain livestock producers.

Appellant CIT Group/Business Credit, Inc. (CIT) is an undisputed secured creditor of the Debtor pursuant to a November 16, 2007, financing agreement (s*ee* Doc. 28-11). In July 2009, CIT answered the Trustee's complaint, filed a counterclaim against the Trustee asserting a first priority security interest in the funds held by the Trustee, and filed a crossclaim for equitable estoppel against other parties claiming an interest in the funds.

Great Lakes Pork, Inc., Johnson-Pate Pork, Inc., and Lehmann Brothers Farms, LLC (PSA Claimants) are livestock producers that sold hogs to the Debtor. PSA Claimants also answered the complaint, filed a counterclaim against the Trustee seeking funds protected under the PSA, and filed a crossclaim against CIT seeking any funds protected by the PSA that had been paid over to CIT. PSA Claimants' claimed interest in the funds held by the Trustee is premised on certain trust protections contained in the PSA.

A recitation of pertinent provisions of the PSA governing statutory trusts is necessary to understand the parties' positions and provide context for their business relationships.

> **(b) Livestock, inventories, receivables and proceeds held by packer in trust for benefit of unpaid cash sellers; time limitations; exempt packers; effect of dishonored instrument; preservation of trust benefits by seller**
> All livestock purchased by a packer in cash sales, and all inventories of, or receivables or proceeds from meat, meat food products, or livestock products derived therefrom, shall be held by such packer in trust for the benefit of all unpaid cash sellers of such livestock until full payment has been received by such unpaid

sellers: … *Provided*, That the unpaid seller shall lose the benefit of such trust if, in the event that a payment instrument has not been received, within thirty days of the final date for making a payment under section 228b of this title, or within fifteen business days after the seller has received notice that the payment instrument promptly presented for payment has been dishonored, the seller has not preserved his trust under this subsection. The trust shall be preserved by giving written notice to the packer and by filing such notice with the Secretary.

**(c) Definition of Cash Sale**
For the purpose of this section, a cash sale means a sale in which the seller does not expressly extend credit to the buyer.

7 U.S.C. § 196.

Each PSA Claimant entered into one or more Uniform Marketing Agreements (UMAs) with the Debtor governing the terms for the sale and delivery of hogs to the Debtor and for the Debtor's payment for those hogs. Prior to 2008, the Debtors and PSA Claimants operated under standard agreements that expressly waived PSA Claimants' rights to a statutory trust under the PSA.

Section 5(c) of the relevant standard agreements governs payment:

MFC and Member expressly agree, pursuant to Section 409(b) of the Act, that the sale of animals hereby contemplated and required is a credit sale as defined or contemplated by the terms of Section 206 of the Act, and Member, upon executing this Agreement, *knowingly and voluntarily* agrees to *waive all rights* to prompt payment, *constructive or statutory trust* or possession established in the Act in consideration for the mutual covenants and agreements provided in this Agreement.

Section 10(b) of the relevant standard agreements governs waivers:

Pursuant to subsection 409(b) of the Act, Member knowingly and voluntarily waives all rights to receive payments in the manner set forth in subsection 409(a) of the Act and agrees to receive payments in the manner set forth and established by this Agreement.

(Docs. 27-2, 28-2, 28-4, 28-38, 28-41) (emphasis added). Each PSA Claimant had an agreement with the Debtor that included identical language. Under these agreements, PSA Claimants were

obligated to provide specific annual hog quotas.

In late 2007, the Debtor secured financing from CIT in exchange for CIT's secured interest in all present and future accounts, inventory, goods, documents of title, general intangibles, investment property, and other collateral. Other collateral was defined to include lockbox, blocked accounts, and other depository accounts of the Debtor.

In early 2008, the Debtor was struggling financially because of a decreased supply of hogs. It sought to increase the number of hogs it received from PSA Claimants in order to replace supply that was lost when other members left the cooperative. To encourage PSA Claimants to supply additional hogs beyond their previous quota commitments, the Debtor agreed that these additional sales would be governed by revised UMAs. PSA Claimants signed these revised UMAs, entitled "Cash Uniform Marketing Agreements" (Cash UMAs), in September and October 2008. The Cash UMAs did not include the express statutory trust waivers that were included in the previous UMAs.

> Section 5 governing payment states merely:
>
> The payment paid by MFC for Market Hogs delivered by member and accepted by MFC under this Agreement shall be in accordance with Exhibit A hereto, which exhibit may be amended from time to time in the same manner as this Agreement.
>
> The waiver provision in Section 9(b) states:
>
> Pursuant to subsection 409(b) of the Packers and Stockyards Act of 1921 (7.U.S.C. 181, *et. seq.*), as now in effect or hereafter amended ("Act"), Producer agrees that all sales hereunder are credit sales and Producer knowingly and voluntarily waives all rights to receive payments in the manner set forth in subsection 409(a) of the Act and agrees to receive payments in the manner set forth and established by this Agreement and Exhibit A. Upon executing this Agreement and Exhibit A, Producer knowingly and voluntarily agrees to waive all rights to prompt payment established in the Act in consideration of the payments, mutual covenants and agreements provided herein and agrees to receive payments in the manner set forth and established by this Agreement and Exhibit A. Member further agrees to execute such additional waivers of the Act's provisions as MFC may hereafter

require, consistent with MFC's financing structure, provided such shall apply equally to all members of MFC.

Exhibit A contains the following language:

Pursuant to subsection 409(b) of the Packers and Stockyards Act of 1921 (7.U.S.C. 181, *et. seq.*), as now in effect or hereafter amended ("Act"), Producer agrees that all sales hereunder are credit sales and Producer knowingly and voluntarily waives all rights to receive payments in the manner set forth in subsection 409(a) of the Act and agrees to receive payments in the manner set forth and established by this Agreement and Exhibit A. Upon executing this Agreement and Exhibit A, Producer knowingly and voluntarily agrees to waive all rights to prompt payment established in the Act in consideration for the payments, mutual covenants and agreements provided herein and agrees to receive payments in the manner set forth and established by this Agreement and Exhibit A. Member further agrees to execute such additional waivers of the Act's provisions as MFC may hereafter require, consistent with MFC's financing structure, provided such shall apply equally to all members of MFC.

(Docs. 27-1, 28-7, 28-8, 28-9, 28-40, 28-42, 28-45). PSA Claimants each began delivering hogs under the Cash UMAs in October 2008. The Bankruptcy Court found that PSA Claimants were not paid for a total of 16,155 hogs valued at $1,815,477.51 that were delivered to the Debtor between December 11, 2008, and January 29, 2009.[1] On February 4, 2009, PSA Claimants sent written notices to the Debtor and to the United States Department of Agriculture (USDA) advising that they had not been paid for the additional hogs.

The Bankruptcy Court denied both parties' motions for summary judgment and held a trial on April 12 and 13, 2010. Following the trial, the Bankruptcy Court found, as a matter of fact, that beginning on or about October 1, 2008, PSA Claimants began delivering additional hogs to the Debtor on cash terms with no waiver and full retention of the producer trust protections under the PSA. The Bankruptcy Court also found, as a matter of fact, that the USDA determined that

---

[1] Great Lakes Pork, Inc. (Great Lakes) sold a total of 11,733 additional cash hogs to the Debtor, valued at $1,320,757.72; Johnson-Pate Pork, Inc. (Johnson-Pate) sold a total of 2,106 additional hogs to the Debtor, valued at $246,302.83; Lehmann Brothers Farms, LLC (Lehmann) sold a total of 2,316 additional cash hogs to the Debtor, valued at $248,416.96.

those additional hog sales are to be treated as cash sales under the PSA, that they are entitled to trust protection under the PSA, and that they are to be paid from the lockbox account that the Trustee holds. The Bankruptcy Court concluded that PSA Claimants are entitled to first priority interest in the funds held by the Bankruptcy Trustee under the PSA's trust protections and the applicable federal regulations.[2]

CIT raises four issues on appeal: (1) the Bankruptcy Court erred when it found that the transactions between the Debtor and PSA Claimants were cash sales under 7 U.S.C. § 196(c); (2) the Bankruptcy Court erred when it found that PSA Claimants were unpaid cash sellers entitled to trust protection under 7 U.S.C. § 196(b); (3) the Bankruptcy Court erred by failing to apply the thirty day limitation required under 7 U.S.C. § 196(b); and (4) the Bankruptcy Court erred when it failed to grant CIT equitable relief via a finding that PSA Claimants were equitably estopped from asserting that they were unpaid cash sellers.

## ANALYSIS

Pursuant to 28 U.S.C. § 158(a), the federal district courts have mandatory exclusive jurisdiction over appeals from final judgments, orders, and decrees of bankruptcy judges. The district court may affirm, modify, or reverse the bankruptcy judge's order, or remand with instructions for further proceedings. FED R. BANKR. P. 8013. District courts, like the Circuit Courts of Appeals, "review a bankruptcy court's determinations of law de novo and findings of fact for clear error." *Wiese v. Community Bank of Cent. Wis.,* 552 F.3d 584, 588 (7th Cir. 2009); FED. R. BANKR. P. 8013. When the trial court correctly states the law, even if the district court would have weighed the evidence differently, the bankruptcy court's factual findings should not be reversed as

---

[2] The Bankruptcy Court held that Great Lakes is entitled to a first priority share in the amount of $1,320,757.72, Johnson-Pate is entitled to a first priority share in the amount of $246,302.83, and Lehmann is entitled to a first priority share in the amount of $248,416.96.

clearly erroneous "[i]f the bankruptcy court's account of the evidence is plausible in light of the record viewed in its entirety." *Freeland v. Enodis Corp.*, 540 F.3d 721, 729 (7th Cir. 2008).

Whether PSA Claimants are entitled to a statutory trust depends on whether the governing agreements comply with the requirements of the statute establishing such trusts. The PSA provides monetary protection for producers and sellers of livestock to meat packers who purchase more than $500,000 annually by explicitly providing that packers shall hold all proceeds derived from the livestock purchased from cash sellers in a trust account. Cash sales are entitled to trust protection under the statute and are defined as those sales "in which the seller does not expressly extend credit to the buyer." 7 U.S.C. § 196(c). This section cannot be read in isolation because it expressly relies on § 409 of the Act to define the methods for making payment.

> **(a) Full amount of purchase price required; methods of payment**
> Each packer … shall, before the close of the next business day following the purchase of livestock and transfer of possession thereof, deliver to the seller or his duly authorized representative the full amount of the purchase price ….
>
> **(b) Waiver of prompt payment by written agreement; disclosure requirements**
> Notwithstanding the provisions of subsection (a) of this section and subject to such terms and conditions as the Secretary may prescribe, the parties to the purchase and sale of livestock may expressly agree in writing, before such purchase or sale, to effect payment in a manner other than that required in subsection (a) of this section.
> ….

7 U.S.C. § 228b. The Secretary of Agriculture has issued regulations exempting only certain sales from the trust protection provisions of the PSA.

> § 201.200 Sale of livestock to a packer on credit.
>
> (a) No packer whose average annual purchases of livestock exceed $500,000 shall purchase livestock on credit, and no dealer or market agency acting as an agent for such a packer shall purchase livestock on credit, unless:
>
> > (1) Before purchasing such livestock the packer obtains from the seller a written acknowledgement as follows:

> On this date I am entering into a written agreement for the sale of livestock on credit to _____, a packer, and I understand that in doing so I will have no rights under the trust provisions of section 206 of the Packers and Stockyards Act, 1921, as amended (7 U.S.C. 196, Pub.L. 94-410), with respect to any such credit sale. The written agreement for such selling on credit
>
> Covers a single sale.
>
> Provides that it will remain in effect until (date).
>
> Provides that it will remain in effect until cancelled in writing by either party.
>
> (Omit the provisions not applicable.)
>
> Date _____
> Signature _____

9 C.F.R. § 201.200. This regulation allows producers that negotiate delayed payment terms to retain PSA trust protection unless such protection is expressly waived.

The Bankruptcy Court found, "[a]fter a thorough review of the provisions of the PSA, in particular § 409(a) thereof and the applicable Code of Federal Regulations," that PSA Claimants established, as a matter of fact, that they are entitled to the trust protections afforded by the PSA. While this Court might have ruled differently on the same question, this Court did not have the benefit of observing the trial and judging the credibility of the witnesses. It is clear from the record that the Cash UMAs do not include the express trust waivers that were in previous agreements. Because they do not include express waivers, they arguably do not comply with the PSA's and the Secretary's requirements for waiver. Any evidence to the contrary is insufficient to show that the Bankruptcy Court's findings were clearly erroneous.

The Bankruptcy Court also found, as a matter of fact, that PSA Claimants are entitled to specific amounts based upon the number of hogs that they each sold to the Debtor after the Cash

UMAs were executed. This finding is not clearly erroneous. CIT claims that PSA Claimants failed to properly preserve its trust. Consequently, CIT argues, PSA Claimants are entitled only to that portion of the sales that occurred within the thirty day period before PSA Claimants gave notice to the USDA and CIT. PSA Claimants respond that this argument was not made or preserved in the Bankruptcy Court. The Bankruptcy Court could have rationally concluded that all unpaid sales made under the Cash UMAs are subject to the statute's trust protections. The Bankruptcy Court had before it all of the dated communications between the parties and all sales records. It awarded a specific amount based upon its consideration of this evidence. Notably, the Bankruptcy Court did not include in this amount any unpaid hogs that were sold under previous agreements. For these reasons, the Bankruptcy Court's decision will not be reversed.

With respect to CIT's request for equitable relief, there is ample evidence to support the reasonableness of the Bankruptcy Court's decision on this issue. CIT argues that PSA Claimants had constructive knowledge of the contents of the terms and scope of CIT's financing agreement with the Debtor. The Bankruptcy Court found that there was insufficient evidence to support the claim that PSA Claimants knew of any specific terms in the financing agreement between CIT and the Debtor. CIT has not established that the Bankruptcy Court's finding was clearly erroneous.

Finally, in their supplemental brief, PSA Claimants wonder: "Must the producer hire legal counsel to negotiate and document every hog sale it makes to a packer to avoid an unwitting waiver of PSA trust rights?" (Doc. 30, p. 15). Without answering that question as to the sale of every hog, this Court simply notes that had outside counsel been involved when the Cash UMAs were drafted and executed, this dispute and its resulting confusion might have been avoided altogether.

## CONCLUSION

For the foregoing reasons, the decision of the Bankruptcy Court is **AFFIRMED**. The Clerk of Court is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED.**

DATED: 06/09/11

                                        s/ *G. Patrick Murphy*
                                        G. PATRICK MURPHY
                                        United States District Judge